# United States Court of Federal Claims
No. 12-142 C
Filed: June 26, 2017

|  |  |
|---|---|
| QUIMBA SOFTWARE, INC., | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| THE UNITED STATES, | ) ) |
| Defendant. | ) ) ) |

*William Thomas Welch*, McMahon, Welch & Learned, Reston, Virginia, for plaintiff.

*Paul Davis Oliver*, United States Department of Justice, Civil Division, Washington, DC, for defendant.

**OPINION AND ORDER**

*SMITH*, **Senior Judge**

    This action is before the Court on Cross-Motions for Summary Judgment. In 2003, plaintiff, Quimba Software, Inc. ("Quimba"), entered into a contract for information management technology research with the Air Force Research Laboratory, Air Force Material Command of the United States Air Force ("AFRL" or "government"). After Quimba completed performance under the contract, the government conducted an audit and issued a decision in 2011 disallowing Quimba's inclusion of deferred compensation costs from its 2004 Incurred Cost Proposal ("ICP").

    In 2012, Quimba filed suit in this Court pursuant to the Contract Disputes Act ("CDA"), 41 U.S.C. § 7104(b), seeking a declaration that the Contracting Officer's Final Decision ("COFD") disallowing deferred compensation costs is null and void, as well as a finding that Quimba's deferred compensation costs are allowable under the Federal Acquisition Regulations ("FAR"). The government asserts a counterclaim against Quimba, alleging that Quimba was overpaid for the disallowable deferred compensation and, as a result, owes the government $50,096.00.

    After extensive analysis and consideration, the Court grants plaintiff's Motion for Summary Judgment and denies defendant's Motion for Summary Judgment.

## I.      Background

### A.      Factual History

On July 10, 2003, the AFRL entered into cost-plus fixed-fee contract number F30602-03-C-0185 ("the contract") with Quimba, for intelligence research, with a cost ceiling of $199,950.00. Plaintiff's Complaint (hereinafter "Compl."), ECF No. 1 at 3. The contract required Quimba to submit invoices or vouchers to the Defense Contract Audit Agency ("DCAA"). Defendant's Cross-Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment (hereinafter "D's CMSJ"), ECF No. 88, Appendix (hereinafter "A_") at 10 (incorporating FAR 52.216-7). The government would then reimburse Quimba for "properly allocable and allowable indirect costs." A12; FAR 52.216-7(b)(1)(ii)(F) (2002).

FAR 52.216-7(a)(1) provides that "[t]he Government will make payments to the Contractor . . . in amounts determined to be allowable by the Contracting Officer in accordance with [FAR] subpart 31.2 in effect on the date of this contract." FAR 52.216-7(a)(1) (2002). Additionally, the regulations state that "[a]t any time or times before final payment, the Contracting Officer may have the Contractor's invoices or vouchers and statements of costs audited." FAR 52.216-7(g) (2002). "Any payment may be (1) reduced by amounts found by the Contracting Officer not to constitute allowable costs or (2) adjusted for prior overpayments or underpayments." *Id.*; D's CMSJ at 4.

DCAA approved one payment of $30,321.77, tendered in February 2004 for costs Quimba incurred in Fiscal Year ("FY") 2003. Compl. at 4. However, at the outset of the contract, Quimba's accounting system and indirect rates were not DCAA-approved. *Id.* at 3. After the government's 2004 payment of $30,321.77 to Quimba for FY 2003 costs, a follow-on audit occurred to sort out the issues with Quimba's accounting system and its indirect rates. *Id.* at 4. Quimba was told that it "would not get paid until its indirect rates were approved by DCAA." Compl. at 3; Plaintiff's Corrected Motion for Summary Judgment (hereinafter "P's MSJ"), ECF No. 99, Exhibit 3 at 2.

Although DCAA and Quimba worked together throughout 2004 to address the deficiencies in Quimba's cost accounting system, Quimba alleges that the company was "prohibited from invoicing on the contract until it had received DCAA approval." Compl. at 5. In September of 2004, the DCAA auditor indicated that any deferred compensation would be unallowable under FAR and the Cost Accounting Standards ("CAS"). *Id.* In response, Quimba argued that "it was the government's non-payment that forced Quimba to defer founders' salaries." *Id.*

On November 24, 2004, DCAA approved Quimba's "provisional billing rates [ ] for interim reimbursement of indirect costs for the fiscal year ending December 31, 2004." A49; Compl. at 7. Despite this approval, Quimba did not receive any additional payments for work completed in 2004 prior to the end of FY 2004, and the audit continued into 2005. Compl. at 7.

Quimba completed work on the contract in March 2005. *Id.* at 8. On April 11, 2005, one of Quimba's owners spoke with a DCAA audit supervisor who informed him that "she had received and approved Quimba's invoices for payment." *Id.* at 9; Defendant's Answer to

2

Plaintiff's Complaint ("Answer") at 9. "All of Quimba's submitted invoices were paid in 2005," including the founders' deferred compensation costs from 2004. Compl. at 8.

Pursuant to FAR 52.215-02 and the contract terms, DCAA had "[three] years after final payment under this contract" in which to audit Quimba's records. FAR 52.215-02 (2002); *accord* A12. In May 2007, DCAA initiated an audit of Quimba's FY 2004 ICP and an audit report was issued in July 2007. Compl. at 9. The auditors questioned $61,124.00 of direct labor costs, invoking FAR 31.205-6(a)(6)(iii), which provides, "[f]or owners of closely held companies, compensation in excess of the costs that are deductible as compensation under the Internal Revenue Code . . . is unallowable." A60. The audit report stated "that wages paid and deducted as compensation under IRS regulations to the two owners [were] significantly less than direct labor claimed on the government contract." *Id.*

On November 8, 2010, based on DCAA's July 2007 audit report, the Contracting Officer issued a notice of intent to disallow $148,684.00 in claimed FY 2004 costs. A109. The Contracting Officer acknowledged that the auditors incorrectly cited FAR 31.205-6(a)(6)(iii) as the basis for questioning the deferred compensation, and he indicated that the correct citation was FAR 31.205-6(b)(2)(i) because the former was not in effect during the life of the contract. *Id.* According to the Contracting Officer, the correct provision is FAR 31.205-6(b)(2)(i), which provides the following language: "for closely held corporations, compensation costs . . . shall not be recognized in amounts exceeding those costs that are deductible as compensation under the Internal Revenue code and regulations under it." *Id.* (alteration in original).

The notice addressed Quimba's arguments that FAR 31.205-6(k) allowed deferred compensation to be included in incurred cost claims with the following statement:

> FAR 205-6(k) explains the costs of deferred compensation awards are allowable provided the costs are measurable and allocated in accordance with 48 CFR 9904-50(b): 48 CFR 9904.415-50(b) states: "if any of the conditions in 9904.415-50(a) is not met, the cost of deferred compensation shall be assignable only to the cost accounting period or periods in which the compensation is paid to the employee[;]"[] and 48 CFR 9904.415-50(a) states "the contractor shall be deemed to have incurred an obligation for the cost of deferred compensation when all of the following conditions have been met: (1) [t]here is a requirement to make the payment(s) which the contractor cannot unilaterally avoid; (2) [t]he deferred compensation award is to be satisfied by a future payment of money, other assets, or shares of stock of the contractor; (3) [t]he amount of the future payment can be measured with reasonable accuracy; (4) [t]he recipient of the award is known; (5) [i]f the terms of the award require that certain events occur before an employee is entitled to receive the benefits, there is a reasonable probability that such events will occur; and (6) for stock options, there must be a reasonable probability that the options ultimately will be exercised."

A110 (emphasis omitted). The Contracting Officer construed FAR 31.205-6(b)(2)(i) and the above CAS requirements to preclude deferred compensation for closely held companies "except in the year in which the compensation is paid." *Id.* The Contracting Officer indicated that,

3

because Quimba's founders had a verbal agreement to pay themselves deferred compensation without specifying the timing or amount of payments, Quimba did not meet the criteria of FAR 31.205-6(k). *Id*.

On March 4, 2011, the Contracting Officer issued his Final Decision, denying the deferred compensation claimed in FY 2004. A111. "During FY 2004, the government paid Quimba $155,271.77 for costs incurred . . . . Therefore, Quimba was overpaid $91,992.77 ($155,271.77 - $63,279.00)." A112. However, in its first Supplemental Brief filed in May 2016, the government admitted this figure is incorrect. Defendant's Supplemental Brief in Support of Defendant's Cross-Motion for Summary Judgment (hereinafter "D's Supp."), ECF No. 104 at 11-12.

On March 1, 2012, Quimba filed its Complaint, appealing the COFD and asserting that the deferred compensation costs are allowable under the FAR and the terms of the contract. Quimba alleges that, because the government prohibited the submission of any invoices during 2004 due to accounting issues, the company had no other choice but to defer its founders' salaries, putting them in an unavoidable situation. Compl. at 5.

In its counterclaim, the government argues that Quimba was overpaid for labor costs incurred in FY 2004 because $76,481.55 was unallowable as deferred compensation under FAR 31.205-6(b)(2)(i) (2003). During the course of briefings, the government revised this number, alleging that Quimba was only overpaid by $50,096.00, rather than the $76,481.55 overpayment alleged in its counterclaim. D's Supp. at 11-12.

### B.   Procedural History

On October 6, 2015, plaintiff filed its Motion for Summary Judgment. On November 13, 2015, the government filed a Cross-Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment. The previous judge held oral argument on the Cross-Motions for Summary Judgment on February 4, 2016. Following the hearing, the judge issued an order stating "[b]ased on the colloquy, the Court orders the parties to file supplemental briefs . . . ." Order, ECF No. 100.

On March 4, 2016, plaintiff filed its Supplemental Brief in Support of its Motion for Summary Judgment. On April 4, 2016, the government filed its Supplemental Brief in Support of its Cross-Motion for Summary Judgment. On April 20, 2016, plaintiff filed a Motion to Strike Defendant's Supplemental Brief, arguing that the government failed to follow the Court's order that briefs be limited to five pages, and that the government's brief failed to address matters specifically requested by the Court. Plaintiff's Motion to Strike Defendant's Supplemental Brief (hereinafter "MTS"), ECF No. 105 at 1-2. The government responded to plaintiff's Motion to Strike on May 9, 2016, and plaintiff filed its reply on May 19, 2016.

The case was assigned to the current judge on June 2, 2016. The Court directed the parties to meet to discuss potential settlement. In October 2016, the parties reported to the Court that they were unable to reach a settlement agreement and asked the Court to hold a limited trial to address certain issues in the pending briefs. The Court held oral argument on the matter on

December 20, 2016.  On January 27, 2017, the Court requested a second round of supplemental briefing.

On February 24, 2017, the plaintiff filed a supplemental brief pursuant to the Court's January 27, 2017 Order.  Defendant filed its Response to Plaintiff's Second Supplemental Brief on March 28, 2017.  Plaintiff filed its Reply in Support of its Second Supplemental Brief on April 11, 2017.  The Cross-Motions for Summary Judgment are now fully briefed and ripe for review.

## II. Discussion

### A. Standard of Review

This Court's jurisdictional grant is primarily defined by the Tucker Act, which provides this Court the power "to render any judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States . . . in cases not sounding in tort."  28 U.S.C. § 1491(a)(1) (2012).  Although the Tucker Act expressly waives the sovereign immunity of the United States against such claims, it "does not create any substantive right enforceable against the United States for money damages."  *United States v. Testan*, 424 U.S. 392, 398 (1976).  Rather, in order to fall within the scope of the Tucker Act, "a plaintiff must identify a separate source of substantive law that creates the right to money damages."  *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc in relevant part).

The Tucker Act further provides that this Court "shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41 [the Contract Disputes Act] . . . on which a decision of the contracting officer has been issued under section 6 of that Act."  28 U.S.C. § 1491(a)(2) (2012).  Pursuant to the CDA, a contractor may appeal a COFD to an agency board, or in lieu of appealing the decision to the agency, the contractor may bring an action directly on the claim in this Court.  41 U.S.C. § 7104(b)(1) (2012).  Here, plaintiff chose to bring this action in the U.S. Court of Federal Claims.

In cases in which there is "no genuine dispute as to any material fact," summary judgment is appropriate and "the movant is entitled to judgment as a matter of law."  Rules of the United States Court of Federal Claims ("RCFC") 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A "genuine" dispute is one that "may reasonably be resolved in favor of either party," and a fact is "material" if it might significantly alter the outcome of the case under the governing law.  *Anderson*, 477 U.S. at 248, 250.  In determining the propriety of summary judgment, a court will not make credibility determinations and will draw all inferences in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  When both parties move for summary judgment, "'the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'"  *Abbey v. United States*, 99 Fed. Cl. 430, 436 (2011) (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

As both parties agree that there are no material facts in dispute in this case, summary judgment is appropriate. Transcript, ECF No. 102 at 3, 22. "It is proper on a motion for summary judgment for this court to engage in interpretation of contracts and statutes." *Adarbe v. United States*, 58 Fed. Cl. 707, 714 (2003); *see also Barseback Kraft AB v. United States,* 121 F.3d 1475, 1479-80 (Fed. Cir. 1997); *Bausch & Lomb, Inc. v. United States,* 148 F.3d 1363, 1365 (Fed. Cir. 1998).

The unresolved issue in this dispute is whether Quimba's inclusion of deferred compensation costs in its 2004 ICP is allowable under the FAR, as it is incorporated in the contract. In order to determine the allowability of the deferred compensation costs, the Court first looks to the plain language of the contract. *See Hercules Inc. v. United States*, 292 F.3d 1378, 1380-81 (Fed. Cir. 2002); *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991).

### B.  Allowability Under FAR 31.205-6(b)(2)(i)

FAR 52.216-7, "Allowable Cost and Payment," is incorporated by reference into Quimba's contract. The regulation provides that "[t]he Government will make payments to the Contractor . . . in amounts determined to be allowable by the Contracting Officer in accordance with [FAR] subpart 31.2 in effect on the date of this contract." FAR 52.216-7(a)(1) (2002); *accord* A12.

FAR 31.205-6(b)(2)(i) states that "[f]or closely held corporations, compensation costs covered by this subdivision shall not be recognized in amounts exceeding those costs that are deductible as compensation under the Internal Revenue Code and regulations under it." FAR 31.205-6(b)(2)(i) (2002); *accord* A213.[1]

It is without question that, at the time of the contract, Quimba was a closely held corporation and that FAR 31.205-6(b)(2)(i) applied to Quimba's compensation costs. A115, A196. As neither Quimba's status nor the applicability of the above FAR provision is in dispute, the outstanding question becomes whether or not the deferred compensation costs in the FY 2004 ICP were deductible under the Internal Revenue Code ("IRC") and its associated regulations in 2004.

### C.  Deductibility of Deferred Compensation

Deductibility of deferred compensation is a complex and nuanced issue governed by section 404 of the IRC, which creates a special set of tax rules for "qualified" and "nonqualified" deferred compensation plans. *See* 26 U.S.C. § 404(a)(1)-(5) (2012). The Federal Circuit has previously interpreted the scope of the section 404 deductibility-timing rules in the following way:

---

[1] Contract number F30602-03-C-0185 was executed on July 10, 2003 and the FAR subpart 31.2 in effect on that date was the October 1, 2002 edition. A211.

> Although section 404(a) is limited to compensation paid "under a plan deferring the receipt of such compensation," section 404 can be triggered even in the absence of such a "plan." Section 404(b) makes the deduction-timing rules of section 404(a) broadly applicable to cases in which "there is no plan," as long as "there is a method or arrangement of employer . . . compensation, which has the effect of a stock bonus, pension, profit-sharing, or annuity plan, or other plan deferring the receipt of compensation." 26 U.S.C. § 404(b).

*Avon Prod., Inc. v. United States*, 97 F.3d 1435, 1439 (Fed. Cir. 1996). The accompanying regulations specify that deferred compensation subject to section 404 is deductible in the year of payment and not in the year of accrual, as long as the payments were made more than two and one-half months after the end of the taxable year in which the services were rendered. *Id.* at 1441; 26 C.F.R. § 1.404(b)-1T (1992).

The government argues that Quimba's deferral of compensation costs from FY 2004 is subject to the section 404 deductibility-timing rules and, accordingly, these costs are only deductible in the year Quimba made the payments. Defendant's Response to Plaintiff's Second Supplemental Brief (hereinafter "D's Resp. to P's Supp. 2nd"), ECF No. 123 at 6.

It is undisputed that the compensation in question was received more than two and one-half months after the end of FY 2004. *Id.*; Plaintiff's Second Supplemental Brief (hereinafter "P's Supp. 2nd"), ECF No. 121 at 5. However, Quimba argues that even if the section 404 deductibility-timing rules apply, 26 C.F.R. § 1.404 provides an exception for the deductibility of accrued but unpaid salaries in limited situations. Plaintiff's Reply in Support of its Second Supplemental Brief (hereinafter "P's R. Supp. 2nd"), ECF No. 124 at 17-18.

While this Court agrees with the government that the application of section 404 to Quimba's deferred compensation is appropriate, the government fails to acknowledge the exception provided by 26 C.F.R. § 1.404, and its applicability to the facts of this case.

### D.  Application of 26 C.F.R. § 1.404(b)-1T

In 1986, the United States Department of the Treasury issued temporary regulations incorporating the amendments of the Tax Reform Act of 1984 regarding section 404 of the IRC and deductibility of deferred compensation. 26 C.F.R. § 1.404(b)-1T (1992). Those temporary regulations, which have since been codified, were in effect during FY 2004. P's R. Supp. 2nd at 18.

26 C.F.R. § 1.404(b)-1T states that, if the compensation is paid more than two and one-half months after the end of the taxable year in which the services were rendered, then the payment "is presumed to be paid under a plan, or method or arrangement, deferring the receipt of compensation." 26 C.F.R. § 1.404(b)-1T, A-2(b)(1) (1992); D's Resp. to P's Supp. 2nd at 6. The paragraph immediately following (b)(1) establishes an exception to the presumption for cases in which the deferral was discernibly unavoidable.

The presumption of "a plan, or method or arrangement" of deferred compensation may be rebutted by "setting forth facts and circumstances the preponderance of which demonstrates that it was *impracticable, either administratively or economically, to avoid the deferral* of the receipt by the employee of the amount of compensation" beyond the two and one-half month period, and that, "as of the end of the employer's taxable year, such impracticability was unforeseeable." *Id.* A-2(b)(2) (emphasis added); *Avon Prod., Inc.*, 97 F.3d at 1440–41 (emphasis added). Section 1.404(b)-1T, A-2(b)(2) provides the following example for reference:

> For example, the presumption may be rebutted with respect to an amount of compensation to the extent that receipt of such amount is deferred beyond the applicable 2 ½ month period (i) either because the funds of the employer were not sufficient to make the payment within the 2 ½ month period without jeopardizing the solvency of the employer or because it was not reasonably possible to determine within the 2 ½ month period whether payment of such amount was to be made, and (ii) the circumstance causing the deferral described in (i) was unforeseeable as of the close of the employer's taxable year.

26 C.F.R. § 1.404(b)-1T, A-2(b)(2) (1992). While the presumption of the deductibility-timing rules in section 404 of the IRC is well-founded, this case is one in which the evidence plainly overcomes the presumption.

### E. Quimba's Deferral Was Unavoidable and Unforeseeable

It is clear to this Court that, had the parties examined the C.F.R. more closely, the rebuttable presumption contained in 26 C.F.R. § 1.404(b)-1T would have resolved this case long ago. Quimba's deferral of its FY 2004 compensation was unintended, unavoidable, and unanticipated. Furthermore, Quimba's financial difficulty, which forced payment of the compensation beyond 2004, was unforeseeable throughout FY 2004.

Quimba received its first payment on the contract in February 2004, totaling $30,321.77, for services rendered at the end of FY 2003. Compl. at 4. As such, Quimba could not have anticipated that future payments would not follow this form and that they would not have received interim payments throughout FY 2004. The funds received in February 2004 were not sufficient to pay the principals' compensation without jeopardizing the solvency of this newly-formed, small business.

While Quimba understood the company would be required to update its accounting system, there was no reason to believe that the updating and approval process would take the entirety of FY 2004 and continue through a significant part of FY 2005. This is not a case in which the company had a prior course of dealing with the government or an understanding of the elusive accounting system requirements.

Even on December 31, 2004, after not having received a single payment from the government for work completed in 2004, Quimba would not have foreseen the government withholding payment past February of 2005, given the timing of the FY 2003 payment and the fact that Quimba had completed an entire year's work under the contract. Had Quimba been

8

paid in February of 2005, presumably the deferred compensation would not have become an issue, given that February is within the IRS's acceptable two and one-half months period under 26 C.F.R. § 1.404(b)-1T. *Id.* A-2(b)(1).

At the end of FY 2004, Quimba was left with no choice: "[D]eferral was the only option [Quimba] had to continue performance on the contract." P's R. Supp. 2nd at 19. As the government forced Quimba's hand, it would be inequitable to find these deferred compensation costs unallowable nearly thirteen years after the fiscal year in question. The facts in this case make it clear that Quimba's situation falls within this limited exception, and, had the government engaged in a more careful review of its own regulations, the parties could have avoided five years of unnecessary litigation. Thus, plaintiff's Motion for Summary Judgment is granted. This Court finds that the deferred compensation costs are deductible under section 404 of the IRC and its accompanying regulations, and therefore, allowable under FAR 31.205-6(b)(2)(i) (2002).

### F. Plaintiff's Motion to Strike

In addition to the Cross-Motions for Summary Judgment, this Court must also issue a ruling on plaintiff's Motion to Strike Defendant's Supplemental Brief, which asserts that the government failed to follow the Court's order requiring that the briefs be limited to five pages, and that the government's brief failed to address matters specifically requested by the Court. MTS at 1-2. This Court agrees with plaintiff's assertion that defendant's supplemental brief exceeded the five-page limit as outlined by the previous judge during the February 4, 2016 oral argument. However, any inequities created by defendant exceeding the page limit were rectified when this Court allowed a second round of supplemental briefing. Furthermore, as this Court is granting *plaintiff's* Motion for Summary Judgment, it is clear that denial of plaintiff's Motion to Strike Defendant's Supplemental Brief is not outcome determinative.

## III. Conclusion

For the reasons set forth above, plaintiff's MOTION for summary judgment is **GRANTED**, and defendant's CROSS-MOTION for summary judgment is **DENIED**. Plaintiff's MOTION to strike defendant's supplemental brief is **DENIED**. The Clerk is directed to enter Judgment in favor of plaintiff, consistent with this opinion.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith,
Senior Judge